**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

THELMA M. ANEWEER,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-2062

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On February 23, 2006, the parties consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 13). The final decision of the Commissioner of Social Security is affirmed.

### I. PROCEDURAL BACKGROUND

Plaintiff Thelma Aneweer filed for Disability Insurance Benefits and Supplemental Security Income Benefits on October 7, 1999, alleging an inability to work due to disability since August 1, 1999. (Tr. 17, 93-95). The Social Security Administration denied Ms. Aneweer's initial application and denied her application again upon reconsideration. Administrative Law Judge (ALJ) John P. Johnson held a hearing for Ms. Aneweer on October 11, 2000. (Tr. 49). The ALJ denied MS. Aneweer's appeal on February 23, 2001. (Tr. 46-48).

The Appeals Council initially declined Ms. Aneweer's request for review on August 10, 2001, but later vacated the ALJ's hearing decision and remanded the case for further

development and a new hearing. (Tr. 77-80). While waiting for the new hearing, Ms. Aneweer filed a second application for benefits. (Tr. 104-106). The Appeals Council consolidated both applications for purposes of the second ALJ hearing held on November 21, 2002. (Tr. 79, 36-39). The ALJ again denied Ms. Aneweer's claim on February 19, 2003. (Tr. 14-16, 17-34).. The Appeals Council denied Ms. Aneweer's request for review on June 22, 2005. (Tr. 9-11). Ms. Aneweer filed this action for judicial review on July 25, 2005 (docket number 3).

## II. FACTUAL BACKGROUND

At the time of the hearing, Ms. Aneweer was 59 years old. She was over the age of 55 at the time of her alleged disability onset date. She completed the 12th grade and her vocationally relevant past work experience includes work as a sales clerk, baby sitter, and day care worker.

### A. Medical History

Ms. Aneweer alleges disability since January 14, 2000[1] due to:

> degenerative changes in her lumbar and cervical spine including spondylosis, with chronic pain symptoms; a neurogenic bladder with recurrent urinary tract infections; sleep apnea; diverticulosis; a hiatal hernia; gastro-esophageal reflux disease (GERD); is status-post bilateral carpal tunnel release; hypertension; a history of plantar fasciitis; an affective disorder; an anxiety disorder; and has more recently been diagnosed as having fibromyalgia based on the criteria established by the American College of Rheurnatology.

(Tr. 19).

### 1. Degenerative Changes in Lumbar and Cervical Spine

The record reflects that Ms. Aneweer received numerous treatments for pain associated with degenerative changes in her lumbar and cervical spine. She underwent

---

[1] Ms. Aneweer altered her disability onset date from August 1, 1999 to January 14, 2000 on her second application for disability benefits.

physical therapy treatments for myofascial pain in her left shoulder from Sartori Memorial Hospital from January of 1997 through her discharge[2] in May of 1997. (Tr. 205-208). Upon referral due to diagnosis of cervical spondylosis, she received physical therapy from Agape Therapy in June of 1997. (Tr. 475). Physical therapist Karmen Woelber indicated that Ms. Aneweer "did not have notable relief with treatment." (Tr. 475).

Regarding spinal symptoms, Ms. Aneweer visited Black Hawk Village Chiropractic from May of 1998 through July of 2000 for chiropractic treatment. The chiropractic reports show that Ms. Aneweer obtained relief from her symptoms only by lying down flat on her back with a pillow under her head.

On December 4, 1998 Ms. Aneweer went to the Covenant Clinic to have a "large lump-like cyst" checked out.[3] (Tr. 232). Dr. Cutler noted that his "[e]xam of the back reveals a pretty significant fatty lipoma, it is soft, non-adherent to the surrounding tissue."[4] (Tr. 231). On December 25, 1998 Ms. Aneweer visited the Allen Memorial Hospital Emergency room and complained of severe left flank pain. (Tr. 268-269). Dr. Lamer prescribed pain medication and advised her to refrain from lifting and to apply moist heat to her back. (Tr. 268-269).

On November 18, 1999 consulting physician Amarnath Kathresal, M.D. examined Ms. Aneweer at the request of the Iowa Disability Determination Services Bureau. Ms. Aneweer informed Dr. Kathresal that she has experienced low back pain for approximately 15 years, primarily limited to her low back and mid-back area. (Tr. 276).

---

[2] Physical therapist Joni Wright indicated in her discharge summary that "[o]verall, Thelma has noted improvement. Continues to get tightness and pain in her neck and shoulder. She feels that it is at a point where she can control it on her own." (Tr. 204).

[3] She also sought treatment for pain during urination and irritation from flea bites.

[4] Dr. Cutler indicated that Ms. Aneweer "hadn't noticed it until last Saturday, she said she has had some back aches that she feels are related to it, especially if she lays down." (Tr. 231).

Dr. Kathresal indicated that her pain does "not shoot anywhere," but she can walk approximately 1 block and cannot sit for more than 15-20 minutes. (Tr. 276). Ms. Aneweer noted that she was unable to lift children due to the pain. (Tr. 276). During an appointment with Dr. Cutler in September of 1999, he asked Ms. Aneweer why she was applying for disability. (Tr. 226). She indicated that "her back continues to bother [her]." (Tr. 226).

Ms. Aneweer sought treatment for severe left back, flank pain on January 15, 2000 at the Covenant Medical Center. (Tr. 290). After running numerous tests, Kent R. Opheim, M.D. noted that it was unlikely that the origin of her pain was from her back or "a radicular type problem." (Tr. 307). Dr. Opheim's notes indicated that "[m]echanical symptoms include muscular spasms and myofascial type pain can produce similar presentations." In addition, the doctor suggested that "[o]ther systemic problems like renal disease, kidney stones, diverticulosis can also be considered." (Tr. 306-307).

Dr. Opheim discharged Ms. Aneweer to Dr. Cutler's care on January 24, 2000. (Tr. 290-291). The discharge summary reflected as follows:

> Radiology showed MRI was normal study. In particular no disc defects or spinal stenosis seen in the lumbar spine. Lumbar plain films showed mild degenerative arthritis in the lower lumbar facet joints, otherwise negative. AP pelvis and oblique left hip was negative.

(Tr. 290)

The day after her discharge from Covenant Medical Center, Ms. Aneweer presented for treatment at Agape Therapy for "lumbar strain with lower extremity radicular symptoms and hip strain. (Tr. 474). Ms. Woelber notes that Ms. Aneweer had moderate resolution with this treatment. (Tr. 474). Dr. Cutler referred Ms. Aneweer to Richard P. Bose, Jr., M.D., D.A.B.A. for pain management. (Tr. 385). Dr. Cutler's referral letter indicated that Ms. Aneweer had experienced "ongoing back problems, but over the course of the past two years she had not previously complained to [him] regarding the amount of pain experienced." (Tr. 385).

Dr. Bose referred Ms. Aneweer to Hyung Choi, M.D. for a neurologic consultation regarding her complaints of lower back and left lower extremity pain.(Tr. 371). On April 20, 2000 Dr. Choi assessed that Ms. Aneweer was "showing signs of S1 radiulopathy on the left with mild motor deficit as well as sensory hyperesthesia." (Tr. 402). Ms. Aneweer complained of neck pain, which Dr. Choi indicated "may indicate cervical spinal stenosis, especially given complaints of some nausea." (Tr. 402). Dr. Choi reported that she would order an MRI to check for evidence of cervical spinal stenosis and an EMG to check the severity of S1 radiculopathy. (Tr. 402). The MRI showed "moderate degenerative disc disease...[o]therwise negative." (Tr. 422). The EMG revealed "no clear electrophysiological evidence for a lumbosacral radiculopathy or entrapment neuropathy in the left lower extremity. (Tr. 419).

Ms. Aneweer returned to Agape Therapy in August of 2000 for physical therapy for "cervical discomfort and headaches, limited cervical ROM and intermittent left upper extremity paresthesia." (Tr. 475). By wearing a posture support device and learning proper stretching methods, Ms. Aneweer's symptoms reduced significantly. (Tr. 475).

From April 23, 2001 through August 5, 2001 Ms. Aneweer received physical therapy for lower extremity radicular symptoms, which were "exacerbated with lumbar extension." (Tr. 475). Ms. Woelber indicates that Ms. Aneweer's radicular symptoms decreased and she was able control the symptoms better with abdominal exercises. (Tr. 475). In a September 12, 2001 letter to Dr. Choi, Ms. Woelber noted that Ms. Aneweer had "reached a point of self-management."[5] (Tr. 478).

---

[5] Ms. Woelber described Ms. Aneweer's progress as follows:
- Elimination of lower extremity radicular symptoms.
- Nearly 75% reduction in verbal discomfort rating.
- Iliopsoas length to enable appropriate standing posture.
- Independence in home exercise.

## 2.  Plantar Fasciitis

In early 2001, Dr. Cutler referred Ms. Aneweer to Randall M. Bremner, D.P.M. for evaluation relating to her bilateral foot pain.  On April 13, 2001 Ms. Aneweer met with Dr. Frankhauser in an evening clinic for heel and arch pain that "radiated to the lateral aspect of the ankle."  (Tr. 446).  Dr. Frankhauser note that she had seen Dr. Choi the previous day.  (Tr. 447).  X rays returned normal results and there was no redness or swelling.  (Tr. 447).

On April 16, 2001 Ms. Aneweer met with Dr. Bremner as a referral from Dr. Frankhauser.  She complained of "right heel and arch pain that radiates into lateral aspect of right ankle."  (Tr. 445).  She noted that she sometimes felt numbness in her toes, that the pain sometimes wakes her from sleep, and that the condition exacerbates when she goes up stairs.  (Tr. 445).  Dr. Mbremner molded an orthotic for her right foot, told her to ice it, continued her on Vioxx, advised her against going barefoot, and recommended some stretching and strengthening exercises.  (Tr. 445).  Ms. Aneweer received physical therapy for her foot, in addition to her back, beginning in April 2001.  (Tr. 22).

On May 2, 2001 she contacted the clinic to report similar problems with her left foot.  (Tr. 446).  On May 3, 2001 Ms. Aneweer noted that her right foot had improved and reiterated that her left foot had started hurting a couple of days earlier.  (Tr. 444). Dr. Bremner gave her a night splint and reinforced her orthotics.  (Tr. 444).  On June 15, 2001 letter to Dr. Bremner, Ms. Aneweer's Ms. Woelber noted that Ms. Aneweer reported a 50% reduction in her left foot symptoms and no longer had "shooting" pains to her heel.  (Tr. 487).  Ms. Woelber inquired as to whether Dr. Bremner wished Ms. Aneweer to have further physical therapy.  (Tr. 487).  Ms. Woelber's progress notes indicate that as of June 22, 2001 Dr. Bremner intended to make custom orthotics for Ms. Aneweer and discontinued physical therapy.  (Tr. 485).

### 3. Affective Disorder

Kristine Conditt, Pd.D. evaluated Ms. Aneweer as to whether she suffered from an affective or anxiety disorder. (Tr. 550-553). Ms. Aneweer drove herself to the session and reported multiple physical ailments. She stated that she was dependent upon pain medication, without which she could "hardly move." (Tr. 550). Dr. Conditt diagnosed Ms. Aneweer with an adjustment disorder with mixed anxiety and depressed moods. (Tr. 553). She set Ms. Aneweer's global assessment of functioning (GAF) at 71, which suggests no worse than mild symptoms or difficulties in social, occupational, or educational activities. (Tr. 553).

On July 31, 2002 Ms. Aneweer met with A. Rahim, M.D. for a psychiatric evaluation upon referral from the Social Security Disability Determination Services Bureau. (Tr. 555-557). Dr. Rahim assessed Ms. Aneweer with an anxiety disorder, NOS, and a depressive disorder, NOS. (Tr. 556). The record does not reflect further treatment for Ms. Aneweer by either Dr. Conditt or Dr. Rahim.

### 4. Other Ailments

Dr. Cutler treated Ms. Aneweer periodically for her neurogenic bladder. (Tr. 226-229). He noted that she "had to cath herself about once a day." (Tr. 229). Ms. Aneweer has also used a C-PAP machine to assist with sleep apnea since May of 1998. At her administrative hearing, Ms. Aneweer testified that the machine worked well and that she sleeps well.

Dr. Cutler noted that "[o]ccasionally her diverticular disease will bother her with some changes as far as pressure in the lower abdomen." (Tr. 229). On June 12, 1998 Ms. Aneweer experienced abdominal discomfort, which Dr. Cutler indicated as "possibly (sic) flare up of diverticulosis." (Tr. 237). Dr. Cutler's treatment notes also indicate that Ms. Aneweer had a hiatal hernia. The record does not reflect further discussion of this condition.

Dr. Choi referred Ms. Aneweer to Dr. Mueller of Cedar Valley Medical Specialists in January of 2001 in order to have a carpal tunnel release performed on her right hand. (Tr. 473). After the operation, Dr. Mueller saw Ms. Aneweer for a few follow up visits through August of 2001. (Tr. 469-472). As of the last visit, Dr. Mueller indicated that Ms. Aneweer was experiencing "some mild occasional shooting pains in her right ring finger." (Tr. 469). Dr. Mueller advised Ms. Aneweer, and informed Dr. Cutler, that if the pains become a bigger problem then she may wish to consider injection or other procedure. (Tr. 469).

On November 12, 2002, Dr. Choi indicated that Ms. Aneweer met the American Rheumatological criteria for fibromyalgia. When asked to indicate the clinical findings, laboratory and test results which show Ms. Aneweer's impairments, Dr. Choi reported "diffuse neck, low back, arm, leg, spinal tenderness." (Tr. 560).

## B. Plaintiff's Subjective Complaints

On October 8, 1999 Ms. Aneweer filled out a Personal Pain/Fatigue Questionnaire. She indicated that her pain starts in the neck, shoulders, middle & lower back, waistline, thigh area, with the pain worse on the left side. Her right knee and feet have a sharp pain and mostly ache. She describes her pain generally as "all over my body I feel stiff and sore all the time." (Tr. 130). Ms. Aneweer noted that her pain and fatigue worsen for varying reasons, sometimes it is triggered by cold weather, when "not moving much," or when she has been on her feet a lot. (Tr. 130). The pain is constant and radiates. (Tr. 130). Use of ice packs, stretching exercises, and "manipulation therapy" assists Ms. Aneweer with the pain. (Tr. 131).

Ms. Aneweer states that pain/fatigue affect her in that she "can't do much for very long" and must sit down often. (Tr. 131). Laying flat on her back provides the best relief. (Tr. 131). She notes that "reaching over or out to do things makes [her] lots" and thus she "must stop often." (Tr. 131). When describing activities that she has had to restrict or stop because of pain/fatigue, Ms. Aneweer notes that she no longer can sew for

longer than a half-hour, can't walk further than a block at a time or else she will "ache for the rest of the day worse than ever," she bakes less, and she vacuums less. (Tr. 131). Pain causes her to wake up "sore" and she sometimes wakes in the night to take medicine. (Tr. 132).

Ms. Aneweer further asserts that the pain has affected her ability to think and concentrate, i.e. she forgets things more easily and must write notes. (Tr. 132). She indicates that the pain has not caused her difficulty in caring for her day to day personal needs, but has limited her ability to use her arms and hands, i.e. she doesn't lift more than 5 to 10 lbs. and her arms ache when she tries to lift or reach above her head or down to pick items up of the floor. (Tr. 132). Ms. Aneweer states that, due to the pain, she can walk about 1 block, stand for 1/2 hour, and sit for 1/2 hour. (Tr. 133).

Ms. Aneweer described her typical day as follows:

> Make bed, eat breakfast. Clean off table and countertop. Wash dishes. Walk around house. Drive 1 mile to grandson's bus stop. Watch children in day care home. make lunch. Drive self to work- 6 miles round trip. Lay 2 children down for naps. Play puzzles, games, coloring, etc. with 1 older child. Make supper. May go to grocery store if need. Sit down for break. Get ready for bed.

(Tr. 133).

On August 24, 2001 Ms. Aneweer filled out a disability report indicating that she has had a lot of headaches, cannot lift more than 3 to 5 lbs., can't walk more than 30 feet without "hurting all over," can't "pick up much" with her right hand, aches all over, shakes a lot, can't sit in one position very long, and has dizzy spells. (Tr. 165). She indicated that she stopped working her child care job at the YMCA due to dizziness and back and neck pain. (Tr. 165). She switched to at-home child care until January 15, 2000. (Tr. 165). At that time she stopped working because "back and neck pain became very severe, couldn't walk much, was very highly sedated with pain medication, was not

capable of keeping up with [the] children and activities or grasping without [her] hand," lack of energy, and absent-mindedness. (Tr. 165).

## C. Competing RFCs

On December 10, 1999 Rodney Carlson, M.D. determined that Ms. Aneweer could occasionally lift 20 lbs., frequently lift 10 lbs., stand and/or walk for about 6 hours in an 8-hour workday, and sit (with normal breaks) for about 6 hours in an 8-hour workday. (Tr. 282). She may push and/or pull without limits, other than limits shown as to lifting and carrying items. Ms. Aneweer could only occasionally climb (i.e. stairs), balance, stoop, kneel, crouch, and crawl. (Tr. 283). Dr. Carlson found no manipulative, visual, communicative, or environmental limitations. (Tr. 284-285).

In an October 28, 1999 letter to the Social Security Disability Examiner, Dr. Cutler assessed Ms. Aneweer's RFC as follows:

> I would say that lifting and carrying a maximum weight between 10 to 15 lbs would be reasonable. Walking seems to be appropriate but long periods of standing, walking or sitting certainly have re-introduced a lot of her back pain. Certainly stooping, climbing, kneeling, and crawling would not be something that she could tolerated on any kind of a regular basis.

(Tr. 275).

Dr. Cutler further found no limits as to sight, hearing, and speaking. He also determined her work environment would be fairly open, although she should be limited as to ability to travel. (Tr. 275).

In a January 26, 2000 letter to the Social Security Disability Examiner, Dr. Cutler re-assessed Ms. Aneweer's RFC as follows:

> Based on her present condition lifting and carrying would be very limited to at least less than 10 lbs. Standing, walking and sitting: She appears to have a pretty appropriate gait but extremes, meaning more than probably a half hour of standing in one position, walking or sitting would be very limited. She

certainly cannot stoop, climb, kneel for any period of time or crawl.

\*\*\*

Work environment would be limited on temperature changes, hazard in regards to the arthritis in that it would cause it to flare-up more preventing her from being able to carry out her normal routine.

(Tr. 319).

On February 25, 2000 Dennis A. Weis, M.D., state agency medical consultant, found that Ms. Aneweer could occasionally lift and/or carry 20 lbs., frequently lift and/or carry 10 lbs., stand and/or walk with normal breaks for a total of about 6 hours in a 8-hr workday, sit with normal breaks for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull.(Tr. 321). Dr. Weis noted occasional postural limitations and no manipulative, visual, communicative, or environmental limitations. (Tr. 321-323).

On September 29, 2000 Robert H. Choi, M.D. found that Ms. Aneweer could occasionally lift and/or carry 20 lbs., frequently lift and/or carry 10 lbs., stand and/or walk with normal breaks for a total of at least 2 hours in a 8-hr workday, sit with normal breaks for a total of less than about 6 hours in an 8-hour workday, and had limited ability to push and/or pull in her upper extremities due to neck pain. (Tr. 543). Dr. Choi indicated that he based his conclusions upon the "[d]egree of neck pain and cervical spondylosis seen on MRI and x-ray of neck." (Tr. 543). Dr. Choi noted occasional limitations regarding climbing, balancing, kneeling, and crouching. (Tr. 544). He further found that Ms. Aneweer should never crawl and that "[a]ny activities that puts stress on neck should be avoided." (Tr. 544). Dr. Choi indicated that she had limited ability to reach as it would likely increase her neck pain. Otherwise she had unlimited ability regarding manipulation. (Tr. 545). He noted no visual or communicative limitations. (Tr. 546). As for environmental limitations, Dr. Choi found no limits as to extreme cold,

wetness, noise, or fumes. (Tr. 546). He determined that she should avoid concentrated exposure to humidity, avoid even moderate exposure to extreme heat and hazards, and avoid all exposure to vibration. (Tr. 546).

On December 10, 2001 David Kirkle, D.O., MPH saw Ms. Aneweer for an orthopedic examination of her shoulders, ankles, and lumbar spine. After conducting the examination, Dr. Kirkle determined her RFC as follows:

> As to the patient's capabilities, I believe that the patient will be able to lift and carry at least upwards of 20-30 pounds on an occasional basis, approximately 15 pounds on a frequent basis. Stand, move about, walk and sit for an 8-hour workday. I believe she should be able to do this as long as she can change positions approximately every hour. Stooping, climbing, kneeling and crawling, I see no problems with this. I don't see any problems at all with her knees, handling objects, see, hearing, speaking, traveling, since her carpal tunnel release she should be able to handle objects without any difficulty, and should have no problems with the other, and no problems with environmental issues.

(Tr. 511).

On January 2, 2002 Gary J. Cromer, M.D. found that Ms. Aneweer could occasionally lift and/or carry 20 lbs., frequently lift and/or carry 10 lbs., stand and/or walk with normal breaks for a total of about 6 hours in a 8-hr workday, sit with normal breaks for a total of about 6 hours in an 8-hour workday, and had unlimited ability to push and/or pull.(Tr. 516). Dr. Cromer indicated occasional postural limitation and unlimited ability to manipulate, except he noted that Ms. Aneweer should "[a]void constant repetitive use of the hands due to the carpal tunnel syndrome." (Tr. 518). Dr. Cromer also found no visual, communicative, or environmental limitations. (Tr. 518-519).

Dr. Cromer indicated that there were treating/examining source conclusions about Ms. Aneweer's limitations or restrictions which were significantly different from his findings. (Tr. 521). Dr. Cromer stated that Dr. Kirkle's findings were largely consistent, however Dr. Cromer indicated that "there are no objective findings to support

[Dr. Kirkle's] recommendation that [Ms. Aneweer] would need to change positions approximately every hour."(Tr. 524).

On November 12, 2002 Dr. Choi filled out a Fibromyalgia RFC Questionnaire. Dr. Choi found that Ms. Aneweer not a "malingerer," and that her impairments were consistent with his described RFC. (Tr. 560). He indicated that her pain would frequently interfere with her attention and concentration. (Tr. 562). He noted that she could sit for only twenty minutes and stand for fifteen minutes, stand and walk for about 2 hours, sit about 4 hours of an 8 hour work day, walk around every 30 minutes for about 3 minutes, take unscheduled breaks for 5 to 10 minutes at a time to lie down, lift 10 lbs. frequently, and lift 20 lbs. occasionally. (Tr. 563-564). She should only occasionally twist, rarely stoop, and never crouch or climb ladders or stairs. (Tr. 565). Dr. Choi further estimated that Ms. Aneweer would miss work about four times a month. (Tr. 566).

### D. Hearing Testimony

The ALJ held Ms. Aneweer's hearing by teleconference on November 21, 2002. The ALJ heard testimony from Ms. Aneweer and Vocational Expert (VE) Elizabeth Albrecht. At the time of the hearing, Ms. Aneweer was 58 years old and lived with her husband. (Tr. 580). She testified that she has been unable to work, due to disability, as of January 14, 2000. (Tr. 580).

From her disability onset time to the time of the second hearing, Ms. Aneweer stated that she gained 30 pounds due to reduced physical activity and side-effects of prescribed medications. (Tr. 580-581). Her husband does most of the housework and all yard work. (Tr. 581-583). When asked why she became more limited in her ability to work around the house, Ms. Aneweer responded:

> Well I've just gotten more sick. It's just more painful to do
> things, and just use my arms. And my legs have gotten worse,
> they give me pains when I bend over, and it's just like they
> kind of go to sleep. I just have to get down on my knees every
> once in a while to do something, and get back up, they feel
> like they're kind of sleepy. And the doctor thinks it's just

13

> from the arthritis shooting through the legs when I put pressure
> on my back.

(Tr. 582).

Previously, Ms. Aneweer worked as a childcare provider in her home and also for 16 years at the YMCA childcare room. (Tr. 584-585). She also worked as a convenience store clerk. (Tr. 585). Ms. Aneweer estimated that she consistently lifted 20 to 30 pounds at the convenience store, and up to 40 to 50 pounds as a childcare provider. (Tr. 586, 587). She further asserted that she no longer could lift such weight levels. (Tr. 589).

When asked why she quit working at the YMCA, Ms. Aneweer stated:

> I was just getting to get (sic) wore out. It was just too many
> at once, and my back was getting back (sic). So that it, you
> know, I had just too much pain in my back from holding [the
> children], and lifting, and my neck was getting real sore all the
> time, And I just felt like I wanted to be home, where I could
> sit down when I needed to, and it was just more comfortable
> at home.

(Tr. 589).

Ms. Aneweer noted that she later quit working at home because she "went into the hospital on the 15th of January, and that was because my back was real, real painful. And they said it was because of arthritis in my back, and I just needed to make a decision as to how much I wanted to wear and tear anymore on it." (Tr. 589).

Ms. Aneweer described her physical limitations. She is able to (1) lift a maximum of 10 pounds; (2) stand 15 minutes[6]; (3) sit 15 minutes[7]; (4) walk 10 minutes[8]; (5) kneel,

---

[6] Ms. Aneweer stated that if she stands longer than 15 minutes "I start having the shooting pains in the middle of my back, and ...I just get so uncomfortable." (Tr. 591).

[7] After 15 minutes of sitting, Ms. Aneweer becomes very stiff and she "can't get up and move real fast." (Tr. 592).

[8] After 10 minutes of walking, Ms. Aneweer gets shaky and "walks crooked." (Tr. 593).

bend, and reach for items in limited amounts. (Tr. 592-594). Ms. Aneweer' physical ailments range as follows: headaches, arthritis (neck), shoulder pain, damaged throat from acid reflux, heart arrythmia, back, sciatic hip pain, arthritic hands, knee pain, and fibromyalgia. (Tr. 598-599). Her daily activities consist of getting up around 7:00 a.m., doing stretching exercises, eating breakfast, and watching television. (Tr. 600). Ms. Aneweer also reads for short stretches of time and does the crossword puzzle. (Tr. 600-601). She occasionally spends ten to fifteen minutes sewing. (Tr. 601). She states that there are probably up to 12 days a month where "I just don't feel like going out at all." (Tr. 602.

The ALJ first posed the following hypothetical to the VE (hereinafter "Hypothetical 1"):

> [W]e have an individual who is 58 years old, she will be 59 years old as of December 1, and was 56 years old as of the alleged onset date of disability. She's a female. She has a high school education. She has past relevant work as you've indicated in Exhibit 28E[9] And she has the following impairments. She has degenerative changes of the lumbar, and cervical spine with complaints of pain. Neurogenic bladder with recurrent urinary tract infections. Sleep apnea, diverticulosis, and a hiatal hernia with gastroesophageal reflux disease. She has status post-bilateral carpal tunnel releases. Hypertension, medically determinable impairments resulting in complaints of shoulder pain, and right knee pain. A history of plantar fascitis. A depressive disorder, no otherwise specified. And heart arrythmias. And as a result of a combination of those impairments and medication or other treatment prescribe for those impairments. She has the residual functional capacity as follows. She cannot lift more than 20 or 30 points. Routinely lift 10 to 15 pounds. With standing, of no more than 60 minutes at a time. No sitting of more than 60 minutes at a time. And no walking of more than

---

[9] The VE indicated that Ms. Aneweer's past relevant work included sales clerk, babysitter, and day care worker. (Tr. 203).

30 minutes at a time. With no---with only occasional bending, stooping, squatting, kneeling, no crawling, only occasional climbing. No repetitive reaching with the arms full extended, or work with the arms overhead. This individual should not be exposed to excessive cold. She should not work at unprotected heights. And she should have no more than a minimal exposure to vibration. She is not able to do very complex, or technical work, but is able to do more than simple, routine, and repetitive work which does not require very close attention to detail. She does require occasional supervision, She should not work at more than a regular pace, and that's using three speeds of pace, being fast, regular, and slow. Would this individual be able to perform any jobs she previously worked at, either as she performed it, or as it is generally performed within the national economy? And if so, would you please specify which job?

(Tr. 626-627).

The VE determined that M. Aneweer would be able to be a daycare worker as it is performed in the national economy, but not as she performed it, and as a sales clerk both as she performed it and as it is done in the national economy. (Tr. 628). Ms. Aneweer asked the VE if, under the following additional conditions to Hypothetical 1, a person would be precluded from competitive employment if the person would: (1) miss work four times a month; and (2) have to take unscheduled five to ten minute work breaks during which the person would have to lie down. The VE found each condition would preclude competitive employment.

The ALJ then posed a second hypothetical to the VE (hereinafter "Hypothetical 2"):

My next hypothetical would be an individual of the same age, sex, education, past relevant work, and impairments as previously specified. And that would be, this would be an individual who would have the residual functional capacity as follow. This individual cannot lift more than five to ten pounds, with no standing or more than 15 minutes at a time, no sitting of more than 15 minutes at a time. And no walking of more than 10 minutes at a time, with only occasional bending , stooping, squatting, or climbing. No repetitive

> pushing or pulling, or with only occasional work with the arms overhead. No repetitive gripping, and no continuous use of the hands for tactile sensation. This individual should not be exposed to excessive cold. She should avoid work at unprotected heights, or around hazardous moving machinery. She should not be exposed to more than minimal amounts of vibration. She should perform no work which requires continuous, clear, oral communication. She is able to do only simple, routine, repetitive work, which does not require close attention to detail. She does require occasional supervision. She should not work at more than a regular pace, or more than a mild to moderate level of stress. Would this individual be able to perform any jobs she previously worked at, either as she performed it, or as it is generally performed within the national economy?

(Tr. 628-629).

The VE determined that such an individual would be precluded from doing any past relevant work. The VE also determined that there would be no transferable acquired skills. (Tr. 630).

## III.  CONCLUSIONS OF LAW

### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial

evidence." Cruse, 867 F.2d at 1184 (quoting <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. <u>Gunnels v. Bowen</u>, 867 F.2d 1121, 1124 (8th Cir. 1989); <u>Gavin v. Heckler</u>, 811 F.2d 1195, 1199 (8th Cir. 1987).

## B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. <u>See</u> 20 C.F.R. § 404.1520(a)–(f); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The five steps are:

(1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

(4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5)    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

<u>Trenary v. Bowen</u>, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (<u>citing</u> <u>Yuckert</u>, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Ms. Aneweer has not engaged in substantial gainful activity since at least 1998. Under the second step, the ALJ determined that Ms. Aneweer has the following medically determinable severe impairments:

> degenerative changes in her lumbar and cervical spine, including spondylosis, with chronic pain symptoms; a neurogenic bladder with recurrent urinary tract infections; sleep apnea; diverticulosis; a hiatal hernia; gastro-esophageal reflux disease (GERD); is status-post bilateral carpal tunnel release; hypertension; a history of plantar fasciitis; an affective disorder; an anxiety disorder; and has more recently been diagnosed as having fibromyalgia based on the criteria established by the American College of Rheumatology.

(Tr. 19).

At step three, the ALJ determined that Ms. Aneweer's impairments neither individually or collectively met or equaled the criteria of any listed impairment. (Tr. 19-26). At step four, the ALJ determined that Ms. Aneweer could perform her past relevant work. (Tr.32). As such, the ALJ found that Ms. Aneweer has not been under a disability, as defined in the Act, at any time since August 1, 1999. (Tr. 32)

## C.  Credibility Determination

Ms. Aneweer claims that the ALJ failed to evaluate her credibility according to the Polaski standard.  See Polaski v. Heckler, 739 f.2d 1320 (8th Cir. 1984).  The Commissioner counters that the ALJ properly discounted the severity of Ms. Aneweer's subjective complaints under Polaski.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole."  Id.  In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Id. at 1321-22.  Subjective complaints may be discounted if inconsistencies exist in the evidence as a whole.  Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

However, "a claimant need not prove that he or she is bedridden or completely helpless to be found disabled."  Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  See also Keller v. Shalala, 26 F.3d 856, 859 (8th Cir. 1994) (finding it error to discredit the claimant's subjective complaints of pain based on her daily activities which consisted of watching television, taking care of her dogs, and doing household chores, which claimant testified she could not do when she was suffering from a disabling headache); Forehand v. Barnhart, 364 F.3d 984, 988 (8th Cir. 2004).  ("We have long stated that to determine whether a claimant has the residual functional capacity necessary to be able to

work we look to whether she has 'the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" (citing McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)).

In finding Ms. Aneweer's credibility eroded, the ALJ relied on a series of inconsistencies that the ALJ determined collectively undermined Ms. Aneweer's allegations regarding the existence, persistence and intensity of her symptoms and functional limitations. Ms. Aneweer contests the ALJ's interpretation of the record and specific findings regarding her credibility.

First, the ALJ noted that Ms. Aneweer "advised Doctor Conditt that she has vision deficiencies, but she drove to the evaluation and the doctor noted no problems with reading psychological testing materials."(Tr. 28). The ALJ further stated that the record contains no objective evidence of a visual impairment. Ms. Aneweer responds that the Conditt report acknowledges that Ms. Aneweer had experienced a decrease in eyesight and further, she has never based her claim for disability upon vision problems. The Commissioner does not specifically address this credibility finding.

Second, the ALJ questioned whether Ms. Aneweer experienced headaches. Ms. Aneweer points out that Dr. Bose did not find evidence of "faking" and in fact prescribed a serious of epidural steroid injections. The Commissioner counters that the ALJ did not diagnose Ms. Aneweer as a "malingerer," but merely evaluated her credibility.

Third, the ALJ found Ms. Aneweer's credibility "eroded by her admission that she never reported the degree of severe pain alleged in her back to her primary care physician despite its existence for over two years." (Tr. 28). Ms. Aneweer disputes this claim and points to numerous references to back pain and prescribed physical therapy sessions. The Commissioner responds that notwithstanding such references, Ms. Aneweer did not indicate the severity of such pain.

Fourth, the ALJ emphasized that Dr. Kirkle found a positive Hoover's sign, which indicates that "the claimant was giving sub-maximal effort during his examination of her exertional capacity." Ms. Aneweer argues that "there is no such finding by Dr. Kirkle." The Commissioner responds that the ALJ provided a "rational and supported finding based on the evidence presented."

Fifth, the ALJ emphasized that Ms. Aneweer exhibited 3 of 5 Waddell's signs, which he determined thus indicated a non-organic component to her pain complaints. Ms. Aneweer argues that the ALJ made a medical diagnosis by stating that the Hoover and Waddell tests indicated sub-maximal effort and/or non-organic components to her alleged pain. The Commissioner cites to a medical dictionary as further support for the ALJ's findings.

Sixth, the ALJ points out that Ms. Aneweer asserts that she has spinal stenosis, but her January 2000 MRI scan found no evidence of stenosis. In response, Ms. Aneweer points out Dr. Choi's addendum to his February 25, 2000 Pre-procedure History and Physical Report that "diagnostic imaging does not always correlate well with the clinical pattern in pain syndromes."[10] (Tr. 394).

---

[10] Dr. Choi continues by noting,

> The patient may have a non-compressive inflammatory radiculopathy or pain referred from other middle compartment pathology which will respond (hopefully) to lumbar epidural steroid injection. With respect to the facet joints, the radiological appearance of degeneration may or may not correlate with pain since normal appearing facet joints can turn out to be the source of pain and facet joints with the appearance of severe degenerative processes may not be and vice versa. The same holds true for the sacroiliac joint and a normal appearance of the sacroiliac joint on imaging studies would not rule out the possibility of pain referred from the sacroiliac joint.

(Tr. 394).

Lastly, the ALJ found that reports from Ms. Aneweer's physical therapist, Karmen Woelber, conflict with Ms. Aneweer's alleged severity of pain. Specifically, the ALJ points out that "during therapy from June to October 2000, the therapist noted the claimant reported improvement in her cervical pain symptoms, her muscle guarding was reduced and the claimant's low back and lower extremity symptoms had reduced with the use of a foot riser with certain chairs and the toilet." (Tr. 29). Ms. Woelber also opined that as Ms. Aneweer's postural strength and endurance improved, her "bouts of shaking" would reduce as well. The ALJ emphasized that after resuming physical therapy treatment for low back and foot pain from April 2001 through September 2001, Ms. Woelber indicated that Ms. Aneweer "no longer had any lower extremity radicular symptoms, had verbalized a 75 percent reduction in her discomfort and was now using an appropriate posture when standing."(Tr. 29).

Ms. Aneweer responds that indications of some improvement in her condition is not the same as substantial evidence that she had recovered from her medical conditions. The Commissioner states that Ms. Aneweer misinterprets the ALJ's statements to refer to recovery. Instead the Commissioner emphasizes that the ALJ found Ms. Aneweer's condition amenable to treatment and had significantly improved with physical therapy.[11]

Regarding the ALJ's credibility analysis, the court questions the relevance of the ALJ's discounting of Ms. Aneweer's headache symptoms[12] and finds disputable whether

---

[11]The Commissioner notes that the Eighth Circuit does not recognize an impairment as a disability where it may be controlled by treatment. (citing Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

[12]The court questions the ALJ's analysis of Ms. Aneweer's trembling episode and the resulting headache.. The ALJ stated that Ms. Aneweer repeatedly denied having headaches and "it was only when being examined by Doctor Bose" that Ms. Aneweer described a headache. However, Dr. Bose observed the trembling episode during his examination as follows:

At this point in the examination the patient began to experience

(continued...)

Ms. Aneweer reported severe as opposed to non-severe back pain to her physician. However, the court finds that the record supports the ALJ's finding that Ms. Aneweer's back condition improved a great deal under therapy. While the court agrees with Ms. Aneweer that such improvement is not the same as full recovery, the court finds that it does support the ALJ's determination that Ms. Aneweer's condition does not reach listing severity. Further, the ALJ reasonably determined that such documented improvement, combined with the presence of a positive Hoover's sign and 3 out of 5 Waddell's signs, diminished Ms. Aneweer's credibility regarding the severity of her pain. The court will not disturb the ALJ's credibility findings.

### D. Treating/Examining Physicians

Ms. Aneweer argues that the ALJ improperly discounted the opinions of her treating physicians, which were consistent with Plaintiff's subjective allegations of pain and fatigue. The Commissioner counters that the ALJ gave valid, legally sufficient reasons for his treatment of both doctor's opinions, i.e., they were internally inconsistent and unfounded in the context of the record as a whole.

---

[12](…continued)

an episode of trembling. I palpated her right radial pulse during this time and noted that the pulse was actually stronger, appearing to have a greater pulse pressure, although it was no more rapid in rate that n previously and continued to be regular. Her pulse was noted to diminish to baseline as the attack subsided. During the attack, she was noted to have visible "twitching" at the mandible. Her vision remanded okay throughout the episode and she experienced n o blurring of vision. She indicates that subjectively she felt "kind of funny." She did have some bitemporal cephalgia, which appeared to have its onset actually as the episode was subsiding.

(Tr. 392).

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001).

"The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements).

In the present case, the ALJ found Dr. Cutler's RFC analysis inconsistent with the objective medical tests, Dr. Cutler's own clinical findings, and treatment notes. The ALJ contrasted Dr. Cutler's findings with the findings of Dr. Weis. Dr. Weis found Ms. Aneweer's X-rays showing (at most) minimal evidence of degenerative disk disease, unremarkable MRIs, that she possessed a good range of motions, and her bone density scans came back normal.

The ALJ accorded Dr. Choi's RFC opinion some evidentiary weight. However, the ALJ questioned Dr. Choi's determination that Ms. Aneweer's diffuse pain in her neck, low back, arm, leg, and spine could be expected to last 12 months or longer. The AlJ

compared such a finding to Dr. Choi's office notes of July 31, 2002 and October 10, 2002 which reported that he would not need to see Ms. Aneweer for two months as she had progressed steadily with physical therapy and was doing fairly well. Dr. Choi's July 31, 2002 letter to Dr. Cutler indicates that Ms. Aneweer "had a trigger point injection to the trochanteric bursa area on the left side. This has helped her hip pain quite a bit." (Tr. 572). Further, Dr. Choi opined that "she is most likely having myalgia as a side effect of the Tricor[13]." (Tr. 572). The ALJ gave lesser weight to those of Dr. Choi's limitations that appeared to be based upon subjective complaints rather than the objective record. The ALJ further found that Dr. Choi's opinion deviated significantly from his own treatment notes that indicated improvement, the evaluation of agency medical consultant, and the reports of improvement from Ms. Woelber.

The ALJ considered Dr. Kirkle's opinion, as an independent orthopedic physician who personally examined Ms. Aneweer, deserving of some evidentiary weight and "to be the most precise" as to Ms. Aneweer's RFC. The ALJ assigned some evidentiary weight to the opinions of the psychologist and psychiatrist who evaluated Ms. Aneweer. However, the ALJ was "not persuaded about speculation that pain symptoms would likely restrict the claimant to working at a slow pace, given her performance on the psychological tests." (Tr. 32).

The court finds that the ALJ properly considered those limitations that were supported by record evidence and gave reasons for the varying weight determinations given to each of the treating, examining, and consulting physicians.

### E. Improper Hypothetical Question

Ms. Aneweer asserts that the ALJ relied upon an improper hypothetical that failed to include all of her impairments and thus did not constitute substantial evidence in support

---

[13] Dr. Choi noted in the letter that he gave Tricor to Ms. Aneweer to combat "diffuse achiness of the muscles, especially in the legs" that she had experienced for the past week. (Tr. 572).

of benefit denial. The Commissioner contends that the ALJ properly considered, and subsequently rejected, those of Ms. Aneweer's subjective complaints that were unsupported by the record as a whole. See Prosch v. Apfel, 201 F. 3d 1010, 1015 (8th Cir. 2000) (the court finds a proper hypothetical to be one that "properly reflected the impairments that the ALJ found to be supported by the record; the ALJ was not required to include impairments not so supported." Id.).

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("These assessments alone [of non-treating physicians] cannot be considered substantial evidence in the face of the conflicting assessment of a treating physician." Id. (citing Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991)); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998) ("If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.").

As set forth previously, the ALJ's hypothetical question properly included only those of Ms. Aneweer's physical impairments which were supported by substantial evidence. A proper hypothetical question serves as substantial evidence when it "capture[s] the concrete consequences of a claimant's deficiencies" which the ALJ accepts as true. Pickney v. Chater, 96 F.3d 294, 297 (8th. Cir. 1997). The court will not reverse the ALJ's decision upon this ground.

### F. Full and Fair Development of the Record

Ms. Aneweer argues that the ALJ erred in failing to fully and fairly develop the record with respect to her limitations. The Commissioner counters that Ms. Aneweer has "not specified in what respect the record is lacking, has not identified any records that the ALJ failed to obtain, and has not alleged the need for further consultative examinations." The Commissioner further points out that an ALJ must re-contact a physician only if faced with records inadequate to make a disability determination or where a conflict or ambiguity must be resolved.

The ALJ is duty bound to "develop the record fairly and fully," Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). "[E]vidence developed in an administrative hearing must be fully and impartially evaluated and resolved to meet the ends of justice, not molded to fit the predisposition of the factfinder." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991). In considering this argument, the Court's inquiry is limited to whether Plaintiff was prejudiced or treated unfairly in the ALJ's development of the record. Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). Absent unfairness or prejudice, a reviewing court may not remand for further proceedings. Id.

Ms. Aneweer bears the burden of proving that she is disabled. Remand for further development of the record is only appropriate where the medical record is "inadequate for [the ALJ] to determine whether [the claimant] is disabled.[14]" Here, the ALJ considered the record evidence and provided his rationale for his varying weight determinations of each relevant medical opinion. The court finds that the ALJ fairly and fully developed the record.

---

[14] 20 C.F.R. § 404.1512(e) provides that remand is appropriate where the medical record "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."

Upon the foregoing,

IT IS ORDERED that the determination of the ALJ is affirmed and this matter is dismissed.

September 16, 2006.

_____
JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT